Opinion
WINDHAM, Justice.
FACTS
The basic documents, the notes and mortgages supposedly signed by the Mi-chels, are not in the record. A summary of the amounts claimed was received in evidence without objection; and, although there is testimony as to what properties were encumbered, there is nothing in the record (as opposed to the complaint) to tie the specific loans to mortgages on any particular property. There is also confusion in the record as to the properties involved.
The “gift deed tract” (which was deeded to Melissa by her father just before his death) is described as (SW1/4NW1/4 Sec. 34) and the “heirship tract” is described as (NW1/4NW1/4 Sec. 34). The mortgage signed by the parents in 1970 (Exhibit 2) covers 2 tracts, one of which matches the “heirship tract.” The J981 mortgage (Exhibit 3) description matches the “gift deed tract.”
With that prologue, the record shows the following time line:
• January-June, 1970. Leonard and Verda Bell apply for and receive a loan for $36,574 to buy cattle and to refinance an existing loan (CF 1337) The loan is secured by a mortgage on two tracts of land (NW1/4NW1/4 section 34 and SW1/4SW1/4 section 27) and is designated CF1524. A condition of the loan is that the Bells secure Life or mortgage insurance, presumably in an amount sufficient to pay off the loan, although this is not clear. (See Defendants’ Exhibit M). In 1965 and 1967, Mr. Bell had assigned two Life Insurance Policies to the Tribe which we assume were related to the previ *13 ous loan (CF 1337) which was refinanced by CF 1524. (See Exhibit I.)
• October, 1981. Leonard and Verda Bell borrow an additional $46,342.49 secured by the “Gift Deed Tract.” (SW 1/4NW1/4 section 34) The only reference to insurance is to fire insurance. The application is not in the record. There is no record of any policy being secured to cover this loan; in fact, no insurance policies are in evidence and there is nothing to show that any claim was made or proceeds paid. The only testimony on the subject is that a life insurance policy in an unspecified amount was somehow included in Leonard Bell’s probated estate and that Verda Bell was the beneficiary.
• 1972-1979. Correspondence between Tribal Credit and American National Insurance Company concerns premium payments on policies covering the life of Leonard Bell.
There are also demands on Leonard Bell for reimbursement but no evidence that this was accomplished. A recap dated January 7, 1975 shows premium payments for numerous loans by various parties including CF 1524. The Policy numbers for this loan match the policies assigned in 1967. (Exhibit I)
However, in a letter dated June 20, 1977, which is part of this exhibit, the number 4864759 first appears; and in a letter to American National dated June 5, 1979 from Tribal Credit, Clara Charlo apologizes for not paying the premium on policy # 07188631. All of the exhibits on this subject relate to loan CF 1524, which is apparently a basic borrower number with subnum-bers for the specific loans.
• August 7, 1984. The Bells, with Tribal approval, gift deed the SW1/4NW1/4 Section 34 parcel to Melissa Bell. Leonard Bell dies the next day.
• August 9, 1984. Tribal Credit posts a “Death Foreclosure” (Exhibit 0) showing the following principal balances[1].
CF-15241 $46,339.90
CF-15242 $49,000.00
CF-15245 $20,314.06
• 1987 1999. Melissa seeks information on her father’s accounts without much success.
• January, 1988. Melissa applies for a loan on the “heirship tract” (RT 76 and 77). The testimony refers to an Exhibit F, described as Credit Committee Minutes, but this was not offered in evidence and does not appear in the record.
• April 22, 1988. Tribal Credit pays itself $59,687.75, distributed as follows: Purchase of log home and 40 acres (Lee Bell Estate) apply to CF-1524 A/R Deaths and foreclosures 1131. $54,994.39 and balance $4,693.36 to 4010 Interest only account. The check memo also recites “advance of funds under CF-31211 (Melissa A. Bell).” (Exhibit Q.) This account number does not match any of the loan numbers in Exhibit 1 (the claimed defaulted loans)
There do not appear to be any loan applications by the Michels in the record (although they are referred to in the testimony) and no documentation of loan disbursements related to any of the loan numbers comprising Tribal Credit’s claim. *14 Melissa testified that: (1) she signed a loan with Tribal Credit with a mortgage on the “gift deed” property (RT 67).
Sometime during this period, Melissa married Leonard Michel.
• June 23, 1995. Melissa and Leonard sign all four of the promissory notes and associated mortgages which are the basis of the claim. Although attached as exhibits to the complaint and described and listed (albeit not entirely correctly) under Agreed Facts in the Pre-Trial Order, these documents were not made exhibits at trial. These appear to be a sort of consolidation of the Michels’ account.
There is nothing in the record showing that the two mortgages on the Leonard and Verda Bell loans (Exhibits 2 and 3) were ever cancelled.
• February, 1996. Melissa enters into an agreement with Tribal Credit, whereby she pays $200 via payroll deduction (she is a tribal employee) every two weeks with $50 applied to each loan. This arrangement continued through September, 2000 (RT 55). These payments were made punctually and she received nothing to indicate dissatisfaction with this arrangement although she admitted receipt of delinquency notices (RT 58). While this evidence was received without objection, these facts appear nowhere in the pleadings nor in the Pre-Trial Order; unless it could be said that this potential complete defense could be subsumed under the general legal issue “Are the four Promissory Notes that form the basis of Plaintiffs Complaint against Defendants valid and enforceable?” At oral argument, defense counsel moved to. conform the pleadings to the proofs adduced. Under Montana Rules of Civil Procedure, such a motion may be made at any time, even after judgment, if the issue is tried with the implied consent of the parties (Rule 15(b)). There is no counterpart in our Rules of Civil Procedure, but we now hold that we have the inherent power to grant this motion and we now do so.
• September, 2000. Foreclosure notices were served, whereupon Melissa discontinues automatic payroll deductions. As of the date of foreclosure, Melissa had paid $40,058,93 on tract 2537, the “gift deed” property (RT54) and $39,144.26 on tract 2536, the “heir-ship” property (RT56), These figures were recited from Exhibits B and E which were accountings prepared by the firm of Elmore Associates. These figures came from her own records. Her unchallenged testimony was that, according to a writing by Clara Charlo of Tribal Credit “the receipts on the loans from the first two (loans) had been destroyed by Tribal Credit and that they were no longer available.” (RT 54.) Unfortunately, neither these exhibits, nor the writing from Tribal Credit, found their way into the record.
Thus, based solely on the record, on loan CF-41081 for $39,391.04, $40,058.93 was paid and $39,144.26 was paid on loan CF-41111 with a beginning balance of $54,664.08.
• January 26, 2001. Complaint to Foreclose Promissory Notes filed. The exhibits to the complaint are the notes and mortgages, which correspond to the loan balances shown on Exhibit 1.
• April 10, 2001. Amended Answer and Counterclaim filed. Answer sets up defenses of negligence, waiver and es-toppel based on the claim of fraud in inducing the making of the loans, failing to secure adequate insurance and *15 coercion and duress in forcing the parties to undertake the obligations. The Counterclaim posits a fiduciary duty running to Melissa and claims unspecified damages based on the same basic grounds as the affirmative defenses.
• April 30, 2001. Plaintiff moves to dismiss the Counterclaim, which the trial court treats as a motion for summary adjudication; and on February 14, 2002, grants, on the ground that Tribal Credit is protected by sovereign immunity.
• October 20, 2004. Pre-Trial Order filed. This Order contains the following under the heading “Agreed Facts”: “1. On or about June 23, 1995, Defendants executed Promissory Notes in the amounts of $39,391.04 (CF-41081), with interest at the rate of 5% per annum, $31,597.55 (CF-41091) with interest at the rate of 10% per annum, $15,838.81 (CF-41101) with interest at the rate of 10% per annum and $54,664.08 (CF—41 111) with interest at the rate of 5% per annum.
2.On or about June 23, 1995, Defendants executed mortgages as security for the promissory notes. The mortgages secured the following real property (sic ):
SW1/4NW1/4 of Section 24 (sic),[2] Township 21 North, Range 21 West, PMM, Lake County Montana consisting of 40 acres, more or less; and NW1/4NW1/4 of Section 34, Townships (sic) 21 North, Range 21 West PMM, Lake County, Montana, consisting of 40.00 acres, more or less.”
We note the parties appear to be agreeing that all of the property described is security for all of the notes. However, this is contrary to the testimony.
This Order also contains the following, under the heading “EXHIBITS”:
“A. Plaintiff anticipates introducing the following exhibits:
1. Exhibits attached to the Complaint filed on January, 26, 2001 and all other Pleadings;”
This, however, was not done, giving rise to the issue of whether these documents may, nonetheless, be considered by this Court.
• October 22, 2004. Trial is held, resulting in a judgment of foreclosure on the four properties described in the complaint. In later proceedings, attorney fees of $34,097.21 and costs of $439.50 are added. There is no transcript of these proceedings.
ISSUES PRESENTED
1. Did Tribal Credit owe a fiduciary duty to Melissa Michel?
2. Was there consideration for Melissa’s promise to take over her father’s obligations? Also, did the consideration, if any, fail in that the record does not reflect that the original mortgages (Exhibits 2 and 3) were ever cancelled?
3. Was there consideration for Leonard’s promise to assume the obligations of Melissa’s father? At oral argument the parties stipulated that a settlement had been reached concerning the “new” mortgages.
4. Is Tribal Credit estopped to foreclose these mortgages because of its failure, negligent or otherwise, either to require insurance or to keep insurance in force to protect its interests? Is it estopped by reason of fraud or duress practiced upon Mel *16 issa in the assumption of these obligations?
5. Has Tribal Credit waived its right to foreclose these mortgages for the same reasons?
6. Were attorney fees properly assessed in that the Promissory Notes (Exhibits A, B, C and D to the Complaint, admitted in the answer and the Pre-Trial Order) were not introduced into evidence; this being the only place where an attorney fee obligation appears?
7. Was the Counterclaim properly dismissed?
8. If Melissa made an agreement for reduced payments and was honoring it, how can the Michels be in default? Are the delinquency notices, which Melissa admits receiving, a sufficient repudiation of the agreement; and, having agreed to this, can Tribal Credit arbitrarily and unilaterally cancel this agreement?
9. Has Tribal Credit sustained its burden of proof for foreclosure on specific properties; specifically, in view of the absence from the evidence of the relevant documents?
STANDARD OF REVIEW
The applicable standard of review in this case is the “clearly erroneous” test, which involves a three part test; first, the Court reviews the record to determine if the findings are based on substantial evidence. If the Court finds substantial evidence, the Court then determines whether the trial court “misapprehended the effect of the evidence;” lastly, if the two determinations are met, the Court may still find a decision clearly erroneous if “the record leaves the court with a firm conviction that a mistake has been committed.”
SUMMARY OF PERTINENT FACTS
The record in this case is confusing. There are many gaps in the proofs adduced and a number of inconsistencies. A summary of the facts and figures which can be ascertained and the important uncertainties follows:
1. Melissa Michel acquired title to allotment 2537 by gift deed on August 7 1984 This property consists of 40 acres and is described as SW1/4NW1/4 of Section 34, Township 21 North, Range 21 West, PMM.
2. As of the date of this transfer, this parcel was subject to a mortgage executed on October 6, 1981 by her parents, Leonard and Verda Bell. This document (exhibit 3) shows a recording date of May 31, 1983. The mortgage recites that it is to secure an indebtedness of $46,342.49. Just how this debt grew to $54,664.08 as recited in the agreed facts section of the Pre-Trial Order is not explained. Tribal Credit presumably filed a claim in Leonard Bell’s estate, although there is no direct evidence of this. All we have is the assumption in a question to Clara Charlo that this was done (RT 40:9-14) and the “Death Foreelo-sure” (Exhibit 0).
3. Melissa inherited allotment 2536 from her father’s estate. This land is described as NW1/4NW1/4 of Section 34. Township 21 North, Range 21 West, PMM. consisting of 40 acres more or less. This property was subject to a recorded mortgage executed on June 18, 1970. (Exhibit 2.) This mortgage (which also included 40 acres In section 27, not here involved) was to secure an indebtedness in the original sum of $36,574.00. After 14 years of payments by the Bells, which apparently reduced the principal to $20,314.06 (Exhibit O), the presumed claim in the Bell estate, and approximately 11 years of non-payment, it is not possible to reproduce the calculation which resulted in a claim of *17 $39,391.04 as recited in the Agreed Facts section of the Pre-Trial Order.
4. The records of payments to Tribal Credit, both on the parents’ loans and on the “new” loans were destroyed by Tribal Credit. (RT 53:20-54:4.) However, Melissa paid a total of $79,203.19 on the gift deed tract and the heirship tract. (RT 56:14-18.)
5. The Mortgages made by the parents (Exhibits 2 and 3) remain of record.
6. There is no record of insurance premiums being paid after June 5 1979, and that is in the form of a letter from Tribal Credit to American National Insurance Company apologizing for non-payment of premiums on Policy # 07188631. This letter also states that Mr. Bell was erroneously told that the premium had been paid when actually the last payment was in 1978. There is no evidence of further payments. (Part of Exhibit I.) This same exhibit contains a number of billings to Mr. Bell seeking reimbursement of premiums paid on three policies, to wit: ##0373739, 04103772 and 04864759 (i.e., numbers which are different from that referenced in the letter of June 5, 1979). These billings are undated except for two, which are dated November 10, 1977 and January 4, 1978.
7. Melissa testified, without contradiction, that she tried for a number of years to get a detailed accounting of her father’s obligations to Tribal Credit. Exhibit A is a letter dated January 23, 1987 to Tribal Credit requesting specific detail on “all the loan transactions on the Leonard E. Bell account.”
8. In early 1996, Melissa met with the Tribal Credit Committee, and they agreed to adjust the payments by automatic payroll deductions of $200 per pay period from Melissa’s salary as a Tribal employee to be applied $50 to each of the four loans. For a time this was increased to $100 per loan per pay period but this proved too much. These payments were made and accepted by Tribal Credit from February, 1996 through September, 2000, when the foreclosure was instituted and Melissa terminated the automatic deductions. (RT 54:17-55:24.) Just how Melissa could have reduced the debt by $79,203.19 on the two mortgages still in dispute at this rate is not made clear in the record. Without the accounting reports, we cannot tell. It may be that some recovery from the Bell estate was included or, perhaps, Melissa made some substantial payments on account between the making of the notes and the commencement of the $200 per payday regime. In any event, we accept as established fact that Melissa paid $79,203.19 on the two debts.
DISCUSSION
As a preliminary matter, we hold that there was consideration for Melissa’s promise, consisting of Tribal Credit’s forbearance in not foreclosing on her father’s mortgages. She must have known of the encumbrances and, in any case, these are recorded documents (Exhibits 2 and 3); and she is charged with knowledge of them. This would be true even if she had purchased the land and claimed to be a Bona Fide Purchaser for Value. However, based on the record before us, these mortgages were never cancelled or cleared.
Also, based on the record before us, there does not appear to be any consideration for Leonard signing the promissory notes still in issue. The answer might be different if he had acquired an interest in the subject real estate; but there is nothing in the record to show that he did.
We hold that Tribal Credit neither waived its rights nor is estopped to assert them for failure to keep insurance in force *18 nor because of any failure to make an insurance claim; if, indeed, there was a policy in force under which a claim could have been made.
We cannot tell from this record if the policy on which Verda was a beneficiary was any of the four policies which had to do with the loans. In any case, if there was an insurance obligation, it was the borrower’s obligation. Tribal Credit should not be responsible for the borrower’s defaults. Nonetheless, the record shows that plaintiff was paying insurance premiums and billing Mr. Bell for reimbursement; at least through 1978. For reasons which do not appear from this record, there was no follow up or claim made on any policy for which premiums were paid.
The trial court found neither fraud nor duress practiced on Melissa in assuming these obligations. Nor was any negligence in the premises found. Melissa had the burden of proof on these affirmative defenses and failed to sustain it. The answer might be different if Tribal Credit owed a fiduciary duty to Michel. However, there is nothing in the record to show that these were anything other than arms-length commercial transactions.
The promissory notes (Exhibits A, B, C and D to the complaint) are not part of the trial record. This is the only place where an obligation to pay attorney fees can be found. Even though the making of these notes is admitted in the answer as well as in the Pre-Trial Order, they are not described in that Order, nor is an attorney fee obligation made an issue in that Order by either side. Owing to this failure of proof, and for substantive reasons which will be discussed below, the attorney fee award cannot be sustained.
Whether the trial court was correct in dismissing the Counterclaim on Sovereign Immunity grounds we need not determine. This dismissal was appealed to this Court as Cause No AP-01-022-CV. In an opinion by Justice Eakin, we held that the case was not ripe for review in that issues remained for the Trial Court based on our holding in Baylor v. CS & KT No. CV-039-92 (1996) 23 ILR 6220. As Justice Eakin pointed out, the same contentions were raised as affirmative defenses. However, except for the defense of lack of consideration as to Leonard, these contentions, as discussed above, are without merit.
Furthermore, this defense is analytically distinguishable from the other defenses which are pleaded. Consideration is a necessary part of a breach of contract claim. It is the plaintiffs burden to establish that the promise sought to be enforced was supported by a consideration; something of value, bargained for and given in exchange for the promise. (Restatement 2d Contracts.) The record does not show that plaintiff sustained this burden as to Leonard on the “old” mortgages. In other words, we do not consider lack of consideration as an affirmative defense. Consequently, we need not determine if these remaining issues, whether raised as a counterclaim sword or an affirmative defense shield, are barred by Sovereign Immunity. We decline to revisit our holding in Bear Don’t Walk v. CSKT AP-03-218-CV.
We now turn to the most difficult issue in the case. This issue arises from the modification freely entered into by Tribal Credit and Melissa, whereby $200 every two weeks was deducted from her pay as a Tribal employee and applied in equal measure to each of the four loans then outstanding. Melissa performed her part of the bargain for over four years until Tribal Credit unilaterally commenced foreclosure proceedings. We hold that the *19 Michels were not in default, that Tribal Credit breached the agreement thereby excusing the further performance of the Michels. The agreement was entered into freely by the parties, the debtor scrupulously made the agreed payments, and Tribal Credit accepted them for over four years, until the agreement was breached and repudiated by Tribal Credit by the filing of the foreclosure notices. This was a major breach of the agreement, which, under well settled rules of contract law, excused further performance by the debt- or.
“A party committing a substantial breach of a contract cannot maintain an action against the other contracting party ... for a substantial failure to perform if the promises are dependant (citation). A substantial or material breach is one that touches the fundamental purposes of the contract and defeats the object of the parties in making the contract.”
17 Am.Jur 2d Contracts § 366 p. 807.
However, it would not be equitable to excuse the debt entirely. To do so would unjustly enrich the Michels. The applicable rule is summarized in § 374 of the Restatement 2d of Contracts as follows:
“[i]f a party justifiably refuses to perform on the ground that his remaining duties have been discharged by the other party’s breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach.” (See also 1 Palmer, Law of Restitution, Ch. 5)
We must also consider the effect of plaintiffs failure to respond to Michel’s reasonable efforts to determine the status of her father’s loan accounts. Many American jurisdictions provide, by statute, an obligation on the part of a mortgagee to respond promptly to requests by interested parties for the status of the loan secured by the mortgage. This rule is set forth in Restatement (Third) of Property, Mortgages § 1.6, and may be summarized as follows: Upon written request for good cause by an interested party, including the holder of an interest in the mortgaged real estate, a mortgagee has a duty to disclose in writing within a reasonable time, the terms and status of the underlying obligation. Failure to respond gives rise to liability for damages.
Melissa was certainly an interested party within the meaning of the rule, and she made a written request on January 23,-1987. She certainly had good cause. We consider thirty days to be a reasonable time within which to respond.
The question then becomes whether the matter should be remanded to the trial court for a determination of the proper amount of restitution and the disposition to be made of the mortgages which remain of record; or, whether there is sufficient information in this greatly flawed record so that an equitable remedy can be fashioned by this Court.
We hold that plaintiff failed to sustain its burden of proof for foreclosure. We further hold that credit should be given for the sum of $79,203.19, which the record shows without contradiction that Melissa paid on the two notes still in contention. However, she must account for the value of the benefit conferred upon her under the rule of Restatement of Contracts 2d § 374. We hold that benefit to be equal to the accrued balances due on the notes secured by exhibits 2 and 3 covering the Gift Deed tract and the Heirship Tract as of the date of Leonard Bell’s death; together with interest at five percent (5%) per annum to and including 30 days after *20 the date of Melissa’s written status request (Exhibit A). We disallow any amount claimed for insurance premiums. We consider the Restatement provision to be a rule of equity. Thus, we do not consider it equitable to permit plaintiff to recover interest after plaintiff had a reasonable time to respond to Melissa’s status request. Also, even though the maintenance of insurance was not plaintiff’s obligation, we do not consider it equitable to permit plaintiff to be reimbursed for insurance premiums when they made no move to recover the benefit.
As we have noted, the secured notes are not in evidence and, therefor, we do not award attorney fees to either party.
There remains the issue of the mortgages. Only the original mortgages are in evidence; and, as far as the record shows, they are still extant. There is a split of authority as to the effect upon a mortgage if the underlying debt is unenforceable for whatever reason. In some jurisdictions, the debt and the mortgage are considered to be separate obligations and if, for example, the debt is barred by limitations, the mortgage continues as a charge on the subject real estate. In other jurisdictions, a mortgage is considered to be only an incident of the debt and if the debt is barred the mortgage is discharged. Cases on both sides of the issue are cited in 55 Am Jur 2d § 683. We consider the latter to be the better rule. We hold that any and all mortgages signed by the defendants in lieu of the original mortgages (Exhibits 2 and 3) and constituting a lien or charge upon the Gift Deed Tract and/or the Heirship Tract as herein-above described are null and void. The validity of the original mortgages is not before us.
DISPOSITION
The Judgment is REVERSED and remanded to the Trial Court to make the following factual determination only upon a limited retrial:
The amount due upon the mortgages admitted as exhibits 2 and 3 as of the date of Leonard Bell’s death together with interest thereon at the rate of five percent (5%) per annum simple interest to and including February 22, 1987, but with no allowance for claimed insurance premiums paid.
And, thereupon, to enter judgment accordingly, after giving credit to the Mi-chels in the sum of $79,203.19. In addition, the judgment shall order any and all mortgages executed by the Michels and made in lieu of the mortgages in evidence as Exhibits 2 and 3 to be expunged. No attorney fees are awarded, however, the Michels are awarded their costs, including costs on appeal.
We Concur: Associate Justice CHUCK WALL, Associate Justice GREGORY T. DUPUIS.

. None of these principal balances match the amounts of the mortgages in evidence. It could be that these include the addition of insurance premiums; however, the record does not reflect this.

. There is no property in Section 24 otherwise mentioned in the record. This is probably a typographical error, but we cannot assume this for purposes of this appeal.